1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| SIMULADOS SOFTWARE, LTD., | ) | Case No. 5:12-CV-04382-EJD |
| | ) | |
| Plaintiff, | ) | **ORDER GRANTING MOTION TO** |
| | ) | **DISMISS** |
| v. | ) | |
| | ) | |
| PHOTON INFOTECH PRIVATE, LTD., | ) | **[Re: Docket Item No. 46]** |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

Presently before the Court is Defendant Photon Infotech Private, Ltd.'s ("Photon" or "Defendant") Motion to Dismiss Plaintiff Simulados Software, Ltd.'s ("Simulados" or "Plaintiff") Amended Complaint ("AC"). See Docket Item No. 46. Federal jurisdiction arises under 28 U.S.C. §1332(a). This case is proceeding in this Court because of the parties' venue selection clause in their contract. See Docket Item No. 15. Having fully reviewed the parties' papers, the Court will GRANT Defendant's motion for the reasons stated below.

**I. BACKGROUND**

Simulados is a Texas software development company based in Houston, Texas. Photon is a technology consulting corporation incorporated in New Jersey with its principal place of business in Chennai, India and a virtual office in San Jose, California. See AC, Docket Item No. 44 ¶¶ 1-2. Simulados developed a program called Certify Teacher, which is a test simulation program used by

1

**United States District Court**
For the Northern District of California

educators to prepare for the Texas Examinations of Educator Standards ("TExES") certification exam. Simulados decided to produce a version of its product compatible with Apple Macintosh ("Mac") computers as well as an internet web application. Id. ¶¶ 3-4.

In early 2009, Photon called Simulados, representing Photon's ability to create a Mac-compatible product and develop a web application. Id. ¶¶ 6-7. Simulados and Photon entered into a contract ("Contract") on March 31, 2009, which consisted of a Statement of Work ("SOW") and a Master Professional Services Agreement ("MPSA"). See Docket Item No. 1-1 (the SOW incorporates all the terms and conditions of the MPSA). In the Contract, Photon represented that the project would start on May 20, 2009 and finish on September 17, 2009. The Contract provided that Photon would complete: CD mastering, migrating the existing source code to Real Basic, convert VB project, add Mac specific BASIC code, add support for New DB format, address performance bottlenecks in product, customize for Mac operating systems, add platform specific paths, tweak for Mac Human Interface Guidelines, provide license key generation and key validation, create a web application, create website authentication certification for downloads, upgrade to database content creator, provide support for reading the content, provide support for modifying content, migrate up to three sample products, and code review. Simulados agreed to pay $23,560 in four installments, the final of which was to be made upon delivery of a complete workable product. Id. at 10-12. The Contract contained the following choice-of-law and forum selection provision: "[t]his Agreement shall be governed by and construed and enforce [sic] in accordance with the laws of the State of California." Id. at 23.

Simulados contends that Photon never fulfilled its obligations under the Contract. On June 9, 2009, Photon communicated to Simulados that it was initiating the project, and represented that there would not be any outstanding serious or critical defects at the time of the site launch, with fewer than five medium defects and fewer than ten low defects. On August 14, 2009, Photon requested that Simulados approve completion of the project's development phase. A teleconference demonstration was held on August 19, 2009 and on September 24, 2009 Simulados received an access link for user testing and approval. During the review, Simulados found 38 low level and 8 critical issues. Simulados requested a status update on the web application and

Case No. 5:12-CV-04382-EJD
ORDER GRANTING MOTION TO DISMISS

1   expressed dissatisfaction that the product was not complete.  On May 3, 2010, Simulados gave

2   Photon a deadline of June 3, 2012 to correct an additional 17 errors.  On May 17, 2010, Photon

3   responded to Simulados' notice, providing a link to incomplete software.  To date, Photon has not

4   provided Simulados with fully functioning web application.  Dkt. No. 44 ¶¶ 12-16.

5          Simulados filed a complaint on May 11, 2012 in the District Court for the Southern District

6   of Texas.  See Docket Item No. 1.  The case was transferred to this Court on August 20, 2012,

7   based on the choice-of-law provision in the Contract.  See Docket Item No. 16.  Simulados filed an

8   Amended Complaint ("AC") on December 11, 2012.  Dkt. No. 44.  On December 24, 2012, Photon

9   filed a Motion to Dismiss, which is presently before the Court.  Dkt. No. 46.  Plaintiffs have filed

10  written opposition to this motion.  See Docket Item No. 51.  The parties engaged in mediation, but

11  failed to reach an agreement regarding arbitration.  See Docket Item No. 63.  Photon re-noticed its

12  Motion on July 23, 2013.  See Docket Item No. 67.  Pursuant to Civil Local Rule 7-1(b), the Court

13  took the motion under submission without oral argument.

14                              **II. LEGAL STANDARD**

15         Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with sufficient

16  specificity to "give the defendant fair notice of what the . . . claim is and the grounds upon which it

17  rests."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotations omitted).  A

18  complaint which falls short of the Rule 8(a) standard may be dismissed if it fails to state a claim

19  upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  "Dismissal under Rule 12(b)(6) is

20  appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a

21  cognizable legal theory."  Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir.

22  2008).  Moreover, the factual allegations "must be enough to raise a right to relief above the

23  speculative level" such that the claim "is plausible on its face."  Twombly, 550 U.S. at 556-57.

24         Claims which sound in fraud are subject to a heightened pleading standard.  Fed. R. Civ. P.

25  9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances

26  constituting fraud or mistake."); Swartz v. KPMG LLP, 476 F.3d 756, 765 (9th Cir. 2007) ("Rule

27  9(b) imposes heightened pleading requirements where 'the object of the conspiracy is

28  fraudulent.'").  The allegations must be "specific enough to give defendants notice of the particular

3

misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." <u>Semegen v. Weidner</u>, 780 F.2d 727, 731 (9th Cir. 1985). To that end, the allegations must contain "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." <u>Swartz</u>, 476 F.3d at 764. In other words, these claims must generally contain more specific facts than is necessary to support other causes of action.

When deciding whether to grant a motion to dismiss, the court must generally accept as true all "well-pleaded factual allegations." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 664 (2009). The court must also construe the alleged facts in the light most favorable to the plaintiff. <u>Love v. United States</u>, 915 F.2d 1242, 1245 (9th Cir. 1988). The court generally "may not consider any material beyond the pleadings." <u>Hal Roach Studios, Inc. v. Richard Feiner & Co.</u>, 896 F.2d 1542, 1555 n. 19 (9th Cir. 1990). However, the court may consider material submitted as part of the complaint or relied upon in the complaint, and may also consider material subject to judicial notice. <u>See Lee v. City of Los Angeles</u>, 250 F.3d 668, 688-69 (9th Cir. 2001). But "courts are not bound to accept as true a legal conclusion couched as a factual allegation." <u>Id</u>.

### III. DISCUSSION

The AC contains the following causes of action: breach of contract, fraud and fraudulent inducement, and violations of the Texas Deceptive Trade Practices Act. <u>See</u> Dkt. No. 44.

**A. Standing**

Photon requests the Court dismiss the entire action based on lack of subject matter jurisdiction. Simulados brings this claim in federal court pursuant to 28 U.S.C. § 1332(a), which requires an amount in controversy over $75,000. Photon claims that because of faults in the Complaint and because of an express limitations clause in the Contract, it is impossible that Simulados could recover over $75,000.

This Court agrees that Simulados' second and third claims under the Texas Deceptive Trade Practices Act ("DTPA") and under the Uniform Commercial Code ("UCC") should be dismissed, as explained below. The Court does not believe that dismissing these claims ipso facto limits Simulados' damages "to a legal certainty," however, dismissal of these claims makes it

4

1   questionable whether the case should remain in this court.  See St. Paul Mercury Indem. Co. v. Red

2   Cab Co., 303 U.S. 283, 289 (1938).  Simulados has failed to make a definite statement showing

3   that its request for damages meets the $75,000 threshold absent the DTPA and UCC claims, which

4   it must do for this Court to determine whether it may properly exercise jurisdiction.  Accordingly,

5   the Court will order Simulados to make a more definite statement.

6   **B. Claims Arising From the Texas Deceptive Trade Practices Act**

7       In its third claim, Simulados argues that Photon's deceptive trade practices violated the

8   DTPA, Tex. Bus. & Com. Code § 17.44.  Simulados contends that Photon's fraudulent conduct

9   vitiated the Contract and the negotiated choice-of-law clause, so California law need not be

10  applied.  Instead, Simulados contends that Texas law applies because Photon solicited Simulados'

11  business in Texas, the Contract was executed in Texas, and Simulados expected to receive the

12  finished product in Texas.  Photon argues that Simulados fails to state a claim under the DTPA, as

13  Texas law cannot apply because the contract states unambiguously that California law applies to

14  causes of action arising from it.  Dkt. No. 1-1 at 23.

15      **1. Enforceability of Choice-of-Law Provision**

16      Federal courts sitting in diversity jurisdiction look to the law of the forum state in choice-

17  of-law determinations.  Fields v. Legacy Health Sys., 413 F.3d 943, 950 (9th Cir. 2005).  In this

18  instance, California's choice-of-law rules govern because the case was transferred to the Northern

19  District of California from the Southern District of Texas.  The Supreme Court of California has

20  stated that California choice-of-law rules and the Restatement (Second) of Conflict of Laws reflect

21  strong policy considerations favoring the enforcement of freely negotiated choice-of-law clauses in

22  contracts.  Nedlloyd Lines B.V. v. Sup. Ct., 3 Cal. 4th 459, 462 (1992).  As such, a freely

23  negotiated contractual choice-of-law provision will be enforced in California unless "(a) the chosen

24  state has no substantial relationship to the parties or the transaction and there is no other reasonable

25  basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a

26  fundamental policy of a state which has a materially greater interest than the chosen state . . ." Id.

27  at 465 (quoting § 187(2) of the RESTATEMENT (SECOND) OF CONFLICT OF LAWS).

28

5

1    Under the <u>Nedlloyd</u>'s analysis under Restatement § 187(2), a court must first determine

2 "(1) whether the chosen state has a substantial relationship to the parties or their transaction, or (2)

3 whether there is any other reasonable basis for the parties' choice of law." <u>Id.</u> at 466.  If neither

4 prong of the inquiry is met, then the court does not need to enforce the parties' choice of law.

5 However, if either part of the test is met, then the court must decide whether the law of the chosen

6 state is contrary to a fundamental policy of California.  If there is a conflict, the court must

7 determine whether California law has a materially greater interest in the determination of the issue

8 than the chosen state.  If California has a greater interest, then the court will not enforce the parties'

9 choice of law.  <u>Id.</u>

10    **2. Application of Test**

11         **a. Substantial Relationship or Reasonable Basis and Fundamental Public**

12         **Policy**

13    Simulados contends that the choice-of-law provision should not be enforced and Texas law

14 should be applied instead, because California has no substantial relationship to the parties or

15 transaction and thus the first prong of Restatement § 187(2) is not met.  Simulados argues that there

16 is no substantial relationship with California because no portion of the project was conducted in

17 California, rather all actions occurred either in Texas or India, and Photon is incorporated in New

18 Jersey, with its principal place of business in India.  Photon, however, contends its North American

19 headquarters are located in San Jose, California and thus there is a substantial connection to

20 California.  Furthermore, Photon contends that the work was to be performed in California and

21 India, not Texas.

22    This Court must decide whether there is substantial relationship to California.  A substantial

23 relationship exists in a state where a party is domiciled, resides, or is incorporated.  <u>Nedlloyd</u>, 3

24 Cal. 4th at 467; <u>see</u> <u>Cardonet, Inc. v. IBM Corp.</u>, No. 06-cv-6637-RMW, 2007 WL 518909 (N.D.

25 Cal. Feb 14, 2007) (where defendant was incorporated and headquartered in New York, there was

26 substantial relationship with New York to meet the first prong of § 187(2)); <u>Hatfield v. Halifax</u>

27 <u>PLC</u>, 564 F.3d 1177 (9th Cir. 2009) (fact that a party was a UK company was enough to establish a

28 substantial relationship between England and the parties); <u>Trust One v. Invest Am.</u>, 134 Cal. App.

6

4th 1302 (2005) (where a company was incorporated and had its principal place of business in California, there was a substantial relationship with California). In this instance, neither party is incorporated nor headquartered in California. The question is whether Photon's San Jose office suffices to establish a substantial relationship with California. In situations where a company is incorporated and headquartered in two different states, either incorporation or principal place of business in a particular state has been deemed a substantial relationship. See Hambrecht & Quist Venture Partners v. Am. Med. Internat., Inc., 38 Cal. App. 4th 1532, 1546 (1995) ("It does not matter that, although incorporated in the chosen state, a party may have its principal place of business in the forum state; that party's 'domicile' in the chosen state provides a sufficient relationship to support the choice-of-law provision."); ABF Capital Corp. v. Grove Properties Co., 126 Cal. App. 4th 204, 217 (2005) (although the party was a Delaware corporation, it had its principal place of business in New York, giving it sufficient connection to New York). The Court finds that Photon's office in San Jose, California, which is its principal place of business in North America, establishes a sufficient relationship with the state to uphold the choice-of-law provision in the contract.

Additionally, the second prong of § 187(2) of the Restatement is met, as applying California law is clearly not contrary to any fundamental policy of California.

### b. Unconscionability

Simulados argues that even if the choice of law provision meets the Nedlloyd analysis, the contract between the two parties is a contract of adhesion and thus the choice-of-law provision is unenforceable and Texas' laws should be applied instead. Under Nedlloyd and its progeny, the weaker party to an adhesion contract may avoid enforcement of a choice-of-law provision by establishing that "substantial injustice" would result from its enforcement or that superior power was unfairly used in imposing the contract. Washington Mutual Bank v. Superior Court, 24 Cal.4th 906, 918 (2001).

To determine whether a contract is one of adhesion, courts analyze whether it is procedurally and substantively unconscionable. Samura v. Kaiser Found. Health Plan, Inc., 17 Cal. App. 4th 1284 (1993); Armendariz v. Found. Health Psychcare Services, Inc., 23 Cal. 4th 83, 114

7

**United States District Court**
For the Northern District of California

1    (2000).  Procedural unconscionability focuses on factors of oppression or surprise.  Flores v.

2    Transamerica HomeFirst, Inc., 93 Cal. App. 4th 846, 853 (2001).  If a weaker party is presented

3    with a contract clause and told to "take it or leave it" without the opportunity for meaningful

4    negotiation, then oppression is present, and therefore the contract is procedurally unconscionable.

5    Szetela v. Discover Bank, 97 Cal. App. 4th 1094, 1100 (2003).  Substantive unconscionability

6    focuses on the fairness or one-sidedness of the term in dispute.  Id.  To be unconscionable, such a

7    term must "shock the conscience" or be harsh or oppressive.  Pinnacle Museum Tower Assn. v.

8    Pinnacle Market Development LLC, 55 Cal. 4th 223 (2012); Szetela, 97 Cal. App. 4th at 1100.

9         Simulados claims that the MPSA is substantially unconscionable because Simulados was

10   not offered an opportunity to negotiate the terms.  Photon contends that there was no oppression or

11   surprise, as both parties are sophisticated merchants and this was not a "take it or leave it"

12   situation.  The Court finds insufficient evidence to support a finding of procedural or substantive

13   unconscionability.

14        Simulados, itself a software development company, was free to contract with any other

15   software provider to create a Mac-compliant version of its software.  Furthermore, the Contract

16   between the two parties appears to be a detailed negotiated agreement, including specific

17   information about the project, making it unlikely that it is a "take it or leave it" situation.[1]

18   Additionally, the terms that Simulados points out to prove unconscionability are routine contract

19   terms and Simulados does not offer any case law decreeing them to be unconscionable.  Many

20   contracts contain choice-of-law provisions as well as limitation-of-liability clauses and courts have

21   not found these clauses to be substantially unconscionable as a matter of law.  The contract does

22   not, as Simulados argues, prevent Simulados from recovery in the event of a breach.  The

23   limitation-of-liability clause expressly allows for recovery of the total amount received by Photon.

24   As such, the Contract is not unconscionable and not a contract of adhesion.

25        For all the reasons articulated above, the choice-of-law provision is enforceable, California

26   law applies to this contract, and Simulados' claim under the DTPA is dismissed.

27

28

---

[1] An example of a "take it or leave it" term is a mandatory arbitration provision in an employee handbook, which employees have to accept as a condition of continued employment.  Kinney v. United HealthCare Services, Inc., 70 Cal. App. 4th 1322, 1329 (1999).

8

Case No. 5:12-CV-04382-EJD
ORDER GRANTING MOTION TO DISMISS

**C. Claims Arising Under the Uniform Commercial Code**

Photon contends that Simulados' claim that it is entitled to remedies outside the contract by virtue of the UCC is implausible and must be dismissed because Article 2 of the UCC applies only to contracts for the sale of goods, not services, and the Contract between the parties is for services. Simulados argues that the Contract is for sale of software, which is considered a good, and thus the UCC applies. For the reasons outlined below, the Court will dismiss any claims arising from the UCC.

The UCC applies to the transaction of goods. Cal. Com. Code § 2102. The UCC defines goods as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale . . ." Cal. Com. Code § 2105. Applying the UCC to software poses a complex issue because transactions for software often combine elements of both goods and services. As such, courts have arrived at different decisions concerning whether software transactions are covered by the UCC.

The primary test used by courts to determine whether software is a good under the UCC is the predominant factor test, where courts look to the "essence of the agreement" on a case-by-case basis to decide how to characterize the transaction. Gross v. Symantec Corp., No. C-12-00154-CRB, 2012 WL 3116158, at *8 (N.D. Cal. July 31, 2012) (citing RRX Indus., Inc. v. Lab-Con, Inc., 772 F.2d 543, 546 (9th Cir. 1985)). Courts determine whether the predominant factor or purpose of the contract is rendition of services, with goods incidentally involved, or is rendition of goods, with labor incidentally involved.

Generally, courts have found that mass-produced, standardized, or generally available software, even with modifications and ancillary services included in the agreement, is a good that is covered by the UCC. In RRX Industries, Inc. v. Lab-Con, Inc., the Ninth Circuit found that a license for mass-produced software for use in medical laboratories was covered by the UCC, even when the software contract also provided for ancillary services such as training, repair, and system upgrading. RRX Indus., 772 F.2d 543 (9th Cir. 1985). The court noted, "[h]ere, the sales aspect of the transaction predominates. The [services] were incidental to sale of the software package and did not defeat characterization of the system as a good." Id. at 546. See also Gross, 2012 WL

Case No. 5:12-CV-04382-EJD
ORDER GRANTING MOTION TO DISMISS

1   3116158, at *8-9 (where a user purchased and downloaded Symantec's pre-existing software from

2   the internet, this court determined that the "essence of the agreement" was the sale of a good);

3   Olcott Intern v. Micro Data, 793 N.E.2d 1063 (Ind. Ct. App. 2003) ("generally-available

4   standardized software" was found to be a good under the UCC); Rottner v. AVG Tech. USA, Inc.,

5   943 F. Supp. 2d 222, 230 (D. Mass. 2013) (noting that the sale of a downloadable computer

6   software is like a sale of tangible goods and that courts nationally have consistently classified the

7   sale of a software package as the sale of a good for UCC purposes); Advent Sys. Ltd. v. Unisys

8   Corp., 925 F.2d 670, 675-76 (3rd Cir. 1991) (noting that the majority of academic commentary

9   supports the view that software fits with the definition of a good under the UCC).

10       Software may still be considered a good even when accompanied by ancillary services,

11   which "are not substantially different from those generally accompanying package sales of

12   computer systems consisting of hardware and software." Advent Sys., 925 F.2d at 676. Such

13   ancillary services include installation, training, and technical support. See Dahlmann v. Sulcus

14   Hosp. Tech. Corp., 63 F. Supp. 2d 772, 775 (E.D. Mich. 1999) (a contract for property

15   management systems incorporating hardware, software, installation, training, and technical support

16   services for plaintiffs' hotels was a contract for goods because the provisions for services were

17   incidental to the agreements for the system); ePresence v. Evolve, 190 F. Supp. 2d 159 (D. Mass.

18   2002) (a contract for software licensing which also included services was determined to be a

19   transaction for goods, as the software programs themselves were the essence of the parties'

20   agreement); Wachter Mgmt. Co. v. Dexter & Chaney, Inc., 282 Kan. 365, 369 (2006) (even when

21   incidental services such as modifications, corrections, maintenance, training, and consulting were

22   provided with software, the services would have been unnecessary if the software had not been

23   purchased, so the transaction is predominantly for a good).

24       Even software adapted for specific needs has been considered a good. In Micro Data Base

25   Systems, Inc. v. Dharma Systems, Inc., 148 F.3d 649 (7th Cir. 1998), the Seventh Circuit

26   determined that the UCC governed a contract for software where one party agreed to adapt its

27   software program for use in the other party's system. The court noted that "labor is a service" that

28   is part of the manufacture of every good and opined, "we can think of no reason why the UCC is

10

Case No. 5:12-CV-04382-EJD
ORDER GRANTING MOTION TO DISMISS

United States District Court
For the Northern District of California

not suitable to govern disputes arising from the sale of custom software."  Id. 654-55.  Similarly, the Third Circuit found that the software contracted for was a good where one party planned to modify its existing software and hardware interfaces for the other party's use.  Advent Sys., 925 F.2d 670.  The court noted, "[t]he fact that some programs may be tailored for specific purposes need not alter their status as 'goods' because the Code definition includes 'specially manufactured goods.'"  Id. at 675.  The Third Circuit found that the advantages of applying the UCC to software transactions (namely uniformity on a range of questions) and the importance of software to the commercial world were strong policy arguments favoring the application of the UCC and that the majority of academic commentary espoused the view that software falls under the UCC.  Id. at 675-76.  See also Commc'ns Group, Inc. v. Warner Commc'ns, 138 Misc. 2d 80, 83 (N.Y. Civ. Ct. 1988) (determining that a contract which provided for the installation of specially designed software equipment for one party's telephone and computer systems, including recording, accounting and traffic analysis and optimizations, modules, buffer, directories and an operational user guide was a transaction of software equipment involving movable, tangible and identifiable products or goods); Waterfront Properties v. Xerox Connect, 58 U.C.C. Rep. Serv. 2d 809 (W.D. N.C. 2006) (agreements for the provision of custom adapted pre-existing computer software and attendant hardware were contracts predominately for goods, which are governed by the UCC).

On the other end of the spectrum, courts in this district and beyond have determined that certain software transactions are better defined as services and therefore are not covered by the UCC.  Where software is designed from scratch, or the transaction is mainly for one party's knowledge and skills in creating software, the software is often found to be a service rather than a good.

In Systems America, Inc. v. Rockwell Software, Inc., No. C-03-2232, 2007 WL 218242 (N.D. Cal. Jan 26, 2007), the agreement entered into between the parties called for development of a final software product for reproduction and distribution to one party's customers.  The developing party developed new software to supplement existing software, provided the source code to an escrow agent, and retained all ownership rights to the software.  The court determined that the contract was for services, not goods, because the essence of the contract was the

11

United States District Court
For the Northern District of California

1   development of software from scratch and the granting of a license for use of the software.[2]  Id. at

2   *4.  Where a contract required a party to design, develop, and implement a tailored, highly

3   complex automated software system, that contract was deemed to be for services, not goods.  State

4   v. Lockheed Martin, No. C-036815, 2002 WL 99554, at *18 (Cal. Ct. App., Jan. 25, 2002).  This

5   district found that even in a situation where an agreement was made for production of physical

6   prototypes, since most of the price paid was for the other party's "knowledge, skill, and ability" to

7   develop software code and test prototypes, the agreement was for services rather than goods.  TK

8   Power v. Textron, 433 F. Supp. 2d 1058, 1062 (N.D. Cal. 2006).  See also Data Processing Serv. v.

9   L.H. Smith Oil Grp., 492 N.E.2d 314, 318-19 (Ind. Ct. App. 1986) (custom-designed accounting

10  software is not a good because no hardware was involved and the contract bargained for the

11  programmer's "knowledge, skill, and ability" rather than standardized software); Pearl Inv. v.

12  Standard I/O, 257 F. Supp. 2d 326 (D. Maine 2003) (custom-made software is distinguishable from

13  pre-existing software – even with custom modifications and upgrades – and is a service); Multi-

14  Tech Sys. v. Floreat, No. Civ-01-1320, 2002 WL 432016, at *3 (D. Minn. March 18, 2002)

15  ("work" toward "jointly developing" a new product is a service . . . "the UCC does not apply to an

16  agreement to design and develop a product, even if compensation under that agreement is based in

17  part on later sales of that product"); Wharton Mgmt. Grp. v. Sigma Consultants, Inc., 50 UCC Rep.

18  Serv. 2d 678 (Del. Super. Ct. 1990) (software contract is for services where a party was hired for

19  its skills to "design, develop, and install computer software which would meet . . . specific needs

20  and objectives . . .").

21        In this instance, Photon was meant to produce a Mac-compliant version of Simulados'

22  existing Windows-based software and an internet web application.  Based on an analysis of the

23  cases concerning the application of the UCC to software transactions, this Court determines that in

24  this particular case, Simulados contracted for a service and the UCC does not apply to this software

25  transaction.  Following other courts, this Court uses the predominance test on a case-by-case basis

26

27

28

---

[2] The Systems America court distinguished the case from Dharma Systems, 148 F.3d 649, stating that the customization of the software in that case was only a small part of the transaction, Advent Systems, 925 F.2d 670, where the contract contemplated limited customization of existing software, and RRX Indus., 772 F.2d 543, which involved installation of preexisting software with minimal service.

Case No. 5:12-CV-04382-EJD
ORDER GRANTING MOTION TO DISMISS

to analyze a transaction that involves elements of both a good and a service.  The Contract between the parties calls for Photon to provide services, skills, and knowledge to customize Simulados' existing product for sale to Simulados' customers.  Although customized software may still be considered a good, here Simulados was not purchasing any software from Photon.  Rather, Photon was only providing services to modify Simulados' already-existing software.  As such, Simulados was contracting only for the modifications, a service, and not for software as a separate good.  Thus, the UCC does not apply to this transaction and any claims arising from it are dismissed.

### IV. CONCLUSION

For all the reasons stated above, the Court dismisses Simulados' second and third causes of action arising under the UCC and DTPA without leave to amend.  Additionally, per Federal Rule of Civil Procedure 12(e), the Court orders that Simulados must file a more definite statement of its request for damages within 30 days of this order, showing that it can recover over $75,000 with the remaining causes of action.  Furthermore, Simulados must plead the claims of fraud and fraud in the inducement separately and meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b).  Simulados may only include additional causes of action in its amended complaint in compliance with Federal Rules of Civil Procedure 15(a)(2) and 16(b)(4).

**IT IS SO ORDERED**

Dated: May 1, 2014

_____
EDWARD J. DAVILA
United States District Judge

Case No. 5:12-CV-04382-EJD
ORDER GRANTING MOTION TO DISMISS